1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
**For the Northern District of California**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

RONALD EL-MALIK CURTIS,

             Plaintiff,

  v.

CITY OF OAKLAND, JENNIFER RAY,
JOSEPH TORRES, JOHN FARRELL, AND
GERALD A. SIMON,

             Defendants.

                                  /

No. C 10-00358 SI

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT;
DENYING PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT**

This is an action brought by plaintiff Ronald Curtis, a firefighter paramedic in the Oakland Fire Department (the "OFD"), against the City of Oakland and various OFD officials for racial discrimination and retaliation in violation of state and federal law as well as the U.S. Constitution. Presently before the Court are cross motions for summary judgment. A hearing was held on the motions on February 17, 2012. Having reviewed the papers and considered the parties' arguments, the Court hereby rules as follows.

## BACKGROUND

Plaintiff Ronald Curtis is African American, and a firefighter paramedic in the Oakland Fire Department. Pl.'s Decl. in Opp'n to Summ. J., ¶ 1, Doc. No. 116 (hereinafter "Curtis Decl."). Plaintiff, who has been employed with the OFD since 2004, alleges that after he transferred to Station 1 of the OFD in 2007, he was subjected to a hostile work environment based on his race; that he experienced retaliation because he reported the racial discrimination; and that the City failed to prevent the discrimination. Id. ¶¶ 1, 2; Second Amended Complaint ("SAC") ¶¶ 11, 37-39.

Station 1 is located in downtown Oakland, and is prized for its special rescue teams. Curtis Decl. ¶ 5. Plaintiff argues that Station 1 has a "reputation and history of hostility toward African-American

firefighters." Pl.'s Mot. at 2 (*citing* Muhammad Decl. ¶ 2)[1]. Defendants dispute that characterization, and point out that Station 1, "like the greater department, is racially diverse." Def.'s Opp. at 1 (*citing* Hom Decl. ¶¶ 17-19). Defendants note that the two Fire Chiefs of the OFD from 1999 to 2011 were both African American (defendant Gerald Simon and Daniel Farrell). Hom Decl. ¶ 19. Defendants also provide data from the Chief Financial Officer and Personnel Manager for the OFD, Donna Hom, regarding the racial makeup of Station 1. *See* Hom Decl., doc. 79. There are typically 27 regular employees assigned to Station 1. ¶ 19. In 2008, after plaintiff joined the Station, 14 employees were white, 5 employees were African-American, 4 were Hispanic, and 4 were Asian-American; racial minorities thus made up approximately half of Station 1. Hom Decl. ¶ 19. The current makeup of Station 1 includes 9 Hispanics, 9 whites, 5 African-Americans and 3 Asian-Americans. Hom Decl. ¶ 20.

Plaintiff initially began working at Station 1 on April 15, 2007, and was permanently assigned to the Station in June 2007. Curtis Decl. ¶ 2. At Station 1, each member was assigned to one of three shifts, A, B or C. Each shift works a 24 hour period, 8 a.m. to 8 a.m., and has the next 48 hours off. Hom Decl. ¶ 2. Except for shift change at 8 a.m., the shifts in a single station do not work with each other. *Id.* According to plaintiff, during the time he worked at Station 1, with the exception of one African-American Firefighter briefly assigned to C-Shift, the only other African-American personnel were assigned to B-Shift. Curtis Decl. ¶ 3.

Plaintiff contends that his arrival was met with a resistance that he "came to believe was based on [his] race." Curtis Decl. ¶ 4. Plaintiff's claims are based on a series of incidents that occurred during his tenure at Station 1, from April 2007 until he successfully pursued reassignment in May 2010. Plaintiff filed a number of internal and external complaints about the incidents. The two external complaints were filed with the Equal Opportunity Programs Division ("EOPD") of Oakland, which conducted extensive investigations of those claims.[2] *See* Nieboer Decl., Exs. E and H (EOPD Reports

---

[1]Defendants have objected to much of plaintiff's evidence, including plaintiff's evidence in support of his claim of a racially hostile work environment. The Court addresses the evidentiary objections to the extent necessary to the resolution of the issues presented by the parties' motions.

[2]Prior administrative findings made with respect to an employment discrimination claim may be admitted as evidence. *See Chandler v. Roudebush*, 425 U.S. 840, 864 n. 39 (1976). Where necessary, the Court cites factual evidence found by the EOPD; it does not rely on the EOPD's legal

1 and 2). Both investigations resulted in a finding that there was not sufficient evidence of a hostile work environment. *Id.* Along with the results of those investigations, defendants have filed a number of declarations, with attached exhibits and testimony, that dispute plaintiff's characterizations of many of the events. While the parties dispute the characterizations of the events and highlight different facts, most of the facts are undisputed.[3]

Plaintiff states that after his arrival at Station 1, he advocated for additional African-Americans to be assigned to the station. Pl.'s MSJ at 3 (citing Curtis Decl. ¶ 6). He successfully encouraged two African-American firefighters, Charles Lightfoot and Ronald Johnson, to join Station 1. Curtis Decl. ¶ 5. Plaintiff claims that "when it became known that [he] had encouraged the other African-Americans to join Station 1," some co-workers began to shun him. Curtis Decl. ¶ 6. In particular, Curtis states that Firefighter Justin Elliot's "attitude and demeanor changed dramatically" after it "became common knowledge that I had encouraged Lightfoot and Johnson to join Station 1." Curtis ¶ 6. Defendants object that this characterization is merely speculation. They point out that Curtis has not identified any statements supporting this supposition, has not demonstrated whether, when or how his activities became "common knowledge," and has not identified any specific people who were aware of his encouragement of other African-Americans to join. Def.'s Reply at 5 (citing Curtis Dep. 47:23-52:14, 160:21-25). Defendants provide numerous declarations by Station 1 firefighters, of various ethnicities and races, stating that they had never heard from any source that Curtis had encouraged African-American firefighters to work at Station 1. Mui Decl. ¶ 2; Simmons Decl. ¶ 7; Elento Decl. ¶ 2; Farrell Decl. ¶ 6.

Plaintiff describes a number of incidents he believes were directed at him or the B-Shift based on race. Plaintiff states that one month after he arrived at the station, his car was vandalized while parked in a lot only accessible by Station 1 employees. Curtis Decl. ¶ 4. He states that on November 29, 2007, a B-Shift member disclosed that he had overheard a conversation amongst C-Shift members

conclusions.

[3]Indeed, as these are cross motions for summary judgment, both parties argue that there are no genuine disputes of material fact.

3

wherein firefighter Monty Gardea described putting pond water in a bottle of maple syrup reserved for B-Shift's use. Curtis Decl. ¶ 8. Five months later, on March 25, 2008, firefighter Mario Castillo was given an order by Captain Erik Logan to purchase food for B-Shift at a grocery store. Castillo returned with items not on the given grocery list, including children's food, and generally an amount of food insufficient to feed the B-Shift. Id. ¶ 9. Plaintiff and Lightfoot confronted Castillo about the purchases, as well as Castillo's earlier statement to other firefighters that B-Shift members were "f–cked up." ¶ 10. Castillo responded that Lightfoot "walked into a room with a beanie or skull cap pulled halfway down his eyes and his chest puffed out." ¶ 11. According to an EOPD complaint later filed by Castillo, Castillo agreed that he made those statements, and said plaintiff responded by asking "would you be happier if he (Lightfoot) painted his face and danced for you." Nieboer Decl., Ex. B-3 (Castillo EOPD Report). This led Castillo to file a racial harassment complaint against plaintiff.[4]

Plaintiff asserts that on May 6, 2008 he learned a member of the A-Shift had witnessed a another firefighter, Justin Elliot , spit in the B-Shift syrup bottle. Curtis Decl. ¶ 13. On June 22, 2008, plaintiff found a dead bird under the bed he occupies, and on July 5, 2008, plaintiff found honey smeared on the floor of the bedroom he uses. Curtis Decl. ¶¶ 15-16.

On  June 17, 2008, plaintiff and four other minority firefighters from B-Shift contacted Oakland's EOPD to file a racial harassment complaint concerning these incidents.  ¶ 13. Lieutenant Simmons went with them to the initial interview, based on his concern about tampering with the syrup bottle, but did not believe there to be any indication that it was based on race. Simmons Decl. ¶¶ 10-11. He declined to join in the complaint. Def.'s Opp. at 2.

The EOPD conducted an investigation of the claims. *See* Nieboer Decl., Ex. E-1 ("EOPD Report 1"). The agency interviewed 15 people at the station and released a 6 page, single-spaced report. *Id.* With respect to the "syrup incidents," the EOPD found that Gardea, sometime in 2007, put tap water into the syrup bottle. EOPD Report 1, at 4. Gardea admitted he did it to "water down" the syrup as a prank on former Battalion Chief Frediani, who was "possessive with the syrup." *Id.* While the EOPD found no direct evidence that Elliot spit in the syrup, they found one firefighter's testimony that he did

---

[4]The EOPD found that Castillo's hostile work environment claim was unsupported.

not recall seeing it occur incredible. *Id.* With respect to the "dead bird incident," the EOPD found that a number of witnesses recalled seeing a dead bird on a window sill during the relevant time period, but none were sure it was the same dead bird that was found under plaintiff's bed. *Id.* With respect to the "honey incident," the EOPD found that two A-Shift employees had played pranks on each other involving saran wrap and honey, which devolved into spreading honey in various parts of the upstairs dorm area, including the location where plaintiff slept. *Id.* at 3. One of the two, Firefighter Prieto, indicated that he attempted to clean up the honey, "but there were probably spots he missed." *Id.* The EOPD Report concluded that the evidence did not support a claim of a hostile work environment because the complainants did not provide sufficient evidence that any of the activity was based on race.[5] *Id.* at 5. The EOPD did find that there was divisiveness and tension at Station 1, and recommended "some team building and diversity training." *Id.*

Subsequent to the first EOPD complaint, further incidents occurred that led plaintiff to file a second complaint. On September 1, 2008, plaintiff's house keys went missing during a shift change; he found them two months later behind a mounted television. Curtis Decl. ¶ 22. On January 28, 2009, Elliot alleged that plaintiff became confrontational and threatened him. Nieboer Decl., Ex. H-9 (EOPD Report 2). Plaintiff allegedly approached Elliot and said, "Are you still up to your same bullshit? . . . Don't be trying to pull that bullshit anymore. Try that shit again and see what happens." *Id.* Elliot reported this to Battalion Chief Lipp, who in turn reported it to Battalion Chief Ray. Ray requested that plaintiff file an internal report, known as a 538 Report, in order to investigate the incident. Nieboer Decl., Ex. H-9. Plaintiff's first 538 Report stated, in its entirety, that "I was instructed to write a 538 report by Battalion Chief Jennifer Ray, about an accusation that was made by firefighter Justin Elliot. I have no further substantial information about what the accusation is. This is a form of retaliation and harassment from a previous complaint I filed." Nieboer Decl., Ex. H-31. Finding this insufficient, Battalion Chief Ray requested plaintiff file another report, answering two questions: "Did you have a conversation with FF Justin Elliot this morning? If yes, what was said?" Nieboer Decl., Ex. H-33.

---

[5]The EOPD warned that, "It is . . . the responsibility of all City employees to behave in a respectful and professional manner. Some of the pranks mentioned above appear to cross this threshold. The practical impact of these behaviors is that workplace morale is likely to be strained."

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    Plaintiff's second 538-8 Report simply states, "Question 1: No. Question 2: N/A." Nieboer Decl., Ex.

2    H-35. Plaintiff later complained that Elliot was not held to the same standard as plaintiff because Elliot

3    was not required to write a report. Nieboer Decl., Ex. H-8.

4         On January 26, 2009, plaintiff hung pictures of African American firefighters on one of the walls

5    of the station that contained other pictures of firefighters. Curtis Decl. ¶ 25. On February 2, 2009,

6    plaintiff overheard white A Shift members joking about the photos he had hung. Curtis Decl. ¶ 25. On

7    February 3, 2009, plaintiff found a large picture of the Station's clown mascot with the words

8    "Downtown Clowns" in large letters hung directly above the photos of the firefighters; this offended

9    plaintiff. Curtis Decl. ¶ 29. However, at his deposition, plaintiff conceded that the clown photo was

10   a picture of the station's mascot which had originally hung where the newly hung photos of African

11   American firefighters now were; that plaintiff himself had taken the clown photo down in order to put

12   the other photos up; and that prior to this incident, plaintiff had not been offended by the clown picture.

13   Pl.'s Dep. 249:3-13 (attached to Jordan-Davis Decl., Doc. 77).

14        Following this incident, while plaintiff was writing a report to complain about the clown photo,

15   his supervisor Captain Torres requested that plaintiff attend a meeting. Curtis Decl. ¶ 29. Plaintiff

16   states that he knew the meeting was supposed to be voluntary, and because he felt uncomfortable about

17   the clown photo, he informed Torres that he was going home sick. *Id.* According to plaintiff, Torres

18   then became "extremely irate and physically aggressive." *Id.*

19        On February 17, 2009,[6] plaintiff filed his second EOPD complaint, alleging hostile work

20   environment and retaliation by the A- and C-Shift crews based on plaintiff's participation in the first

21   EOPD complaint. Curtis Decl. ¶ 32; Nieboer Decl., Ex. H (EOPD Report 2). The second EOPD

22   complaint identified actions by A- and C-Shift members, and various supervisory officers, including

23   defendants Battalion Chief Jennifer Ray ("Ray"), Lieutenant Farrell, and Captain Torres. The second

24   EOPD complaint included, among other allegations, the September 2, 2008 missing-house-keys

25   incident, the January 28, 2009 incident with Elliot, the February 3, 2009 clown picture incident, and the

26   February 3 incident involving a verbal altercation with Torres. ¶ 32; *see* Nieboer Decl., Ex. H.

27   _____

28        [6]The actual EOPD report states that the complaint was received March 16, 2009. Nieboer Decl.,
     Ex. H-1.

6

United States District Court
For the Northern District of California

The EOPD interviewed 39 witnesses and issued a 19-page report.  *See* Nieboer Decl., Ex. H.  Regarding the house-key incident, the EOPD discovered no evidence as to who was responsible for the missing keys, nor was any evidence uncovered to support a nexus between the incident and allegations of retaliation or racial discrimination.  EOPD Report 2, at 7.  Regarding the inquiry by Battalion Chief Ray regarding the altercation with Elliot, the investigation found corroboration of plaintiff's threats to Elliot by Firefighter Emke.  EOPD Report 2, at H-9.  The EOPD concluded that "the evidence suggests that Complainant instigated the incident with Firefighter Elliot.  Evidence also indicates that he antagonized his Battalion Chief and acted in an insubordinate manner by refusing to follow her directive when she was attempting to perform her job."  EOPD Report 2, at H-10.  Regarding the clown picture incident, the EOPD found that plaintiff admitted he removed the clown picture, that Engineer Schorr found the picture on a filing cabinet, and that Captain Ready hung it back on the wall in the available space above the newly hung pictures.  The EOPD concluded that "the picture was simply hung back on the wall where it previously hung."  EOPD Report 2, at H-13.  Finally, regarding the February 3, 2009 altercation with Torres, the EOPD investigation "did not uncover evidence to support Complainant's allegations. Rather, the evidence suggested that Complainant acted in an inappropriate and disrespectful manner towards his superior officers."  Id. at H-15.  The report concluded that the investigation "did not uncover evidence to support Complainant's numerous allegations of retaliation and/or race discrimination in violation of [OFD Rules].  In fact, a number of Complainant's allegations were based on hearsay and gossip, and the evidence in each of these instances refuted Complainant's version of the alleged incidents."  *Id.*  The report recommended that the work environment be closely monitored to ensure that it is free from discriminatory and/or retaliatory behaviors, and that team-building sessions should continue.

Plaintiff describes a number of other incidents at the station which occurred after the filing of the second complaint.  On April 1, 2009, mediator Dan Bay was brought in, and held a meeting with plaintiff, defendants Ray and Torres, and a number of other B-Shift members.  Curtis Decl. ¶ 33.  Plaintiff states that Bay's attempts at mediation failed to address the complaints of harassment and racism.  *Id.* ¶ 34.  Battalion Chief Ray submits her notes from the meeting.  Price Decl., Ex. 49.  The notes document complaints regarding the clown picture and lost keys, and that plaintiff asked, "Why

are we here? What are the issues? What is the plan?" *Id.* (labeled OAK FD 2899).

On August 7, 2009, plaintiff saw a homophobic poster hanging inside of Elliot's locker. Curtis Decl. ¶ 37. Plaintiff believed the poster was illustrative of the racist climate at Station 1, and reported the poster to Battalion Chief Melinda Drayton and Lieutenant Jason Lloyd. *Id.* Following the complaint, Elliot's co-workers on the A-Shift stated that they did not want to work with plaintiff, because, according to plaintiff, they could not work with someone who might file a complaint against them. Curtis Decl. ¶¶ 37-38. Plaintiff does not state who made this statement. As a result of this incident, the OFD called in a counselor from the Claremont Employee Assistance Program to "defuse the situation." *Id.*

Plaintiff also complains of an event which occurred at shift change on September 1, 2009. Plaintiff tried to perform the change-of-shift narcotic exchange report with the firefighter paramedic on the A-Shift, Frank Mui. Curtis Decl. ¶ 40. Mui informed plaintiff that he "did not want to talk directly with me." Curtis Decl. ¶ 41. Lt. Simmons informed Mui that department rules required both paramedics to communicate directly with one another. ¶ 42. Captain Torres was present during part or all of the September 1, 2009 incident, and on September 3, 2009, Captain Torres reported that plaintiff had displayed unprofessional behavior by speaking in a hostile and intimidating tone towards Mui. Hom Decl., Ex. E-1 (Oct. 22, 2009 Reprimand). On October 22, 2009, Lt. Simmons, who had also witnessed the September 1 incident, wrote a letter stating that both parties were vocal in the altercation, and that plaintiff had not been hostile or aggressive towards him (Simmons). Price Decl., Ex. 31. Simmons also attaches a declaration stating that while he did not believe plaintiff was acting in an intimidating manner toward Mui, "I do not know how Mui felt during the vocal confrontation with plaintiff." Simmons Decl. ¶ 18.

Plaintiff has two other complaints about Torres. Plaintiff states that while Torres was on an extended leave in 2008, Captain Erik Logan had implemented a driving rotation for the purpose of permitting all B Shift members to improve their fire truck driving skills. Curtis Decl. ¶ 45. In 2009, following his return, Torres abolished the rotation system and assigned an Asian-American firefighter, Bruce Fontelera, to do all of the driving. *Id.* ¶ 46. Plaintiff believes this had an adverse impact on all of the African-American firefighters assigned to B-Shift. *Id.* In his declaration, Lt. Simmons states that

8

he had numerous conversations with Captain Torres about the decision to institute a permanent driver, that he does not believe it was based on race, that the decision whether to have a permanent driver is within the Captain's discretion, and that the C-Shift, for example, has traditionally operated with a permanent driver. Simmons Decl., ¶ 16.

Plaintiff also states that on December 6, 2009, Torres led a training session with the fire truck ladder and that Torres refused to allow plaintiff to participate in the training. Curtis Decl. ¶ 48. The training occurred after an alarm call. At his deposition, plaintiff admitted that he may have raised the aerial ladder during the alarm call. Curtis Dep., 343:3-354:24. Torres states that he understood plaintiff had done well with that task and therefore recommended another a more junior firefighter, Wale Forrester (African-American), do it instead. Torres Decl. ¶ 27. Plaintiff testified that he had heard Fontelera tell Torres that plaintiff had done a good job raising the aerial ladder. Curtis Dep., 345:20.

Plaintiff received two disciplinary actions near the end of his tenure at station 1. Plaintiff argues that the disciplinary actions were retaliatory in nature. The first was a written reprimand, issued on October 22, 2009. It was based on the events of September 1 (speaking in a hostile tone toward Mui), February 27, 2009 (neglecting to complete a report requested by Captain Torres), and February 3, 2009 (in which plaintiff did not attend a meeting after requested to do so by Torres and displaying aggressive and unprofessional behavior toward Torres). On January 5, 2010, plaintiff was given notice of intent by the City to suspend him for one shift. Hom Decl., Ex. G-1 (Notice of Intent). The notice cited an incident that occurred during a roll call on September 16, 2009, in which the narcotics documentation exchange was discussed. Plaintiff interjected negative comments, and told Captain Torres "you don't have the ability to understand this, or handle this." *Id.* When Captain Torres requested that the discussion discontinue, plaintiff refused. *Id.* The suspension was also based on the prior written reprimand. *Id.* Plaintiff does not dispute the facts of the incident, but argues that incorrect procedures were followed in issuing the disciplinary actions. Curtis Decl. ¶ 44.

In December of 2009, plaintiff submitted requests to transfer out of Station 1. His requests were initially denied. After involvement from his union, plaintiff was transferred to Station 6 in May, 2010.

Curtis filed his initial complaint in this court on January 26, 2010. He filed the Second Amended Complaint ("SAC") on October 5, 2010. Plaintiff alleges four causes of action solely against

1    the City of Oakland: racial discrimination, retaliation, and failure to prevent discrimination in violation

2    of California's Fair Employment and Housing Act, Government Code Section 12940 *et seq.* ("FEHA"),

3    as well as racial discrimination in violation of 42 U.S.C. § 1983.  Plaintiff alleges two causes of action

4    against individual defendants Ray, Torres and Farrell: discrimination against plaintiff based on his race

5    in violation plaintiff's constitutional rights under the Fourteenth Amendment's due process and equal

6    protection guarantees, pursuant to §§ 1981 and 1983.   Finally, plaintiff alleges that all defendants

7    violated his right to be free from retaliation as provided by § 1981.  Plaintiff seeks monetary damages

8    and injunctive relief.

9         On January 6, 2012, the parties filed cross motions for summary judgment.  A hearing was held

10   on the motions on February 17, 2012.

11

12                                        **LEGAL STANDARD**

13        A district court "shall grant summary judgment" if the pleadings and supporting documents,

14   viewed in the light most favorable to the nonmoving party, "show[] that there is no genuine issue of

15   material dispute as to any material fact" and the moving party "is entitled to judgment as a matter of

16   law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Falcon Enters.,*

17   *Inc. v. Publishers Serv., Inc.*, 438 Fed. Appx. 579 (9th Cir. 2011).  In a motion for summary judgment,

18   "[if] the moving party for summary judgment meets its initial burden of identifying for the court those

19   portions of the materials on file that it believes demonstrate the absence of any genuine issues of

20   material fact, the burden of production then shifts so that the non-moving party must set forth, by

21   affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for

22   trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing

23   *Celotex*, 477 U.S. 317).

24        In judging evidence at the summary judgment stage, the Court does not make credibility

25   determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to

26   the non-moving party.  *See T.W. Electric*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd.*

27   *v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir.

28   1991).  The evidence presented by the parties must be admissible.  *See* Fed. R. Civ. P. 56 (c)(2).

1  Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine

2  issues of fact and defeat summary judgment.  *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d

3  730, 738 (9th Cir. 1979).

4

5                                          **DISCUSSION**

6  **1.      Narrowing plaintiff's claims**

7          In the moving papers, plaintiff narrows a number of his claims.  *See* Pl.'s Opp. at 1, n.1.  He

8  does not oppose dismissal of any due process claim under the Fourth and Seventh Causes of Action,

9  brought pursuant to 42 U.S.C. § 1983 against defendants City, Ray, Torres and Farrell.  *Id.*  He also

10  agrees to dismissal of any claims brought under a disparate treatment theory.  All such claims are

11  therefore DISMISSED.

12          The Court will turn to whether either party is entitled to summary judgment on plaintiff's

13  hostile work environment, retaliation, and failure to prevent claims.

14

15  **2.      Hostile work environment**

16          Hostile work environment claims are cognizable under FEHA, Title VII, and § 1981.  *See*

17  *Leland v. City and County of San Francisco*, 576 F. Supp. 2d 1079 (N.D. Cal. 2008); *see also Manatt*

18  *v. Bank of America*, 339 F.3d 792, 797 (9th Cir. 2003) ("legal principles guiding a court in a Title VII

19  dispute apply with equal force in a § 1981 action.").  To establish a  *prima facie* case for a hostile work

20  environment claim, plaintiff must raise a triable issue of fact as to whether (1) he was subjected to

21  verbal or physical conduct because of his race, (2) the conduct was unwelcome, and (3) the conduct

22  was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive

23  work environment.  *Surrell v. California Water Serv.*, 518 F.3d 1097, 1108 (9th Cir. 2008).  In

24  considering whether the discriminatory conduct was "severe or pervasive," the Court looks to "all the

25  circumstances, including the 'frequency of the discriminatory conduct; its severity; whether it is

26  physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

27  interferes with an employee's work performance.'"  *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1110

28  (9th Cir. 2000) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998)).  In addition,

United States District Court
For the Northern District of California

the working environment must be both objectively hostile, as perceived by a reasonable person, and subjectively hostile, as perceived by the plaintiff himself. *Leland*, 576 F. Supp. 2d at 1101.

Defendants argue that plaintiff has failed to show either that he was subjected to verbal or physical conduct because of his race (prong 1), or that the conduct was sufficiently "severe or pervasive" to create an abusive work environment (prong 3).

### A.   Verbal or physical conduct based on race

Defendants argue that none of the alleged acts of harassment had any connection to plaintiff's race. Defendants point out that plaintiff does not contend that anyone ever made a race-related remark about him, used epithets, slurs or other derogatory language, or engaged in any negative racial stereotyping. Def.'s Mot. at 21. Plaintiff argues that he need not show "name calling," and that incidents defendants claim to be race-neutral on their face "were in fact racially motivated." Pl.'s Reply at 4. In his opposition to defendants' motion, plaintiff points to the following incidents as the basis for his claim of a hostile work environment:

> 1. B-Shift Firefighters were informed that Monty Gardea, a firefighter with C-Shift, had tampered with the maple syrup bottle which was reserved solely for the B-Shift.
>
> 2. In May 2008, a witness reported to [B-Shift Firefighters] that the same syrup bottle had actually been spat in by FF Justin Elliot.
>
> 3. In March 2008, Mario Castillo, a firefighter with A Shift, admitted to plaintiff and Lightfoot that he had been making negative comments about the B-Shift being 'f—ed up' to firefighters from other stations.
>
> 4. Plaintiff found a dead bird under his bed, honey smeared on the floor near his bed and a broken jar of honey left near the bed.
>
> 5. Plaintiff's house and car keys and garage door opener mysteriously disappeared during a shift change between B and C, and were later found behind a TV set mounted over six-and-a-half feet above the floor.
>
> 6. After plaintiff hung pictures of African-American firefighters on the wall, he overheard white firefighters making jokes about the pictures.
>
> 7. The next day, someone hung a large picture of a clown above the same photos, making it appear as if the African-American firefighters were all "clowns."

Pl.'s Opp., at 20-21. Plaintiff further argues that despite complaints about the aforementioned actions,

the City "simply failed to take prompt effective remedial action." *Id.*

Because plaintiff's claim regarding the clown picture is the one that most directly implicates race, the Court will address that claim first. The Court agrees that on its face, placing a picture of a clown directly above recently hung pictures of African-American firefighters raises a question of racial harassment. However, after reviewing the evidence and placing the incident in context, the incident loses its character as an act of harassment. In his declaration, plaintiff admits the picture of the clown, which carries the logo "Downtown Clowns," is in fact the Station's mascot. *See* Curtis Decl. ¶ 28. At his deposition, plaintiff further conceded that the clown picture previously hung where he placed the pictures, and that he had taken the clown picture down himself:

> Q. Do you recall where the clown was hanging prior to the incident that you just described?
> A. Yes.
> Q. Where?
> A. It was in a space that – where there were now photos of other fire fighters that – I had gotten permission to put up photos of other fire fighters. And I was informed that I was able to take that photo down to make room for these other fire fighters that was already agreed upon we were going to put up on the walls of the station.
> . . .
> Q. Prior to hanging the photographs that you hung, did you – were you offended by the picture of a clown that was on the wall?
> A. No.

Pl.'s Dep. 249:3-13 (attached to Jordan-Davis Decl., Doc. 77). The EOPD, which investigated plaintiff's claims, interviewed members of Station 1 about the clown picture. They found that:

> Engineer Schorr [of the A-Shift] reported that he found the picture of the clown mascot in the TV room on top of a filing cabinet. He said that he was not looking for it, but came across it. He said that he walked into the kitchen and told some of his crew [A-Shift] about finding the clown picture, but he could not remember who the crew members were at the time.

> Captain Ready [also of the A-Shift] indicated that he did not remember who located the picture of the clown mascot, but he hung it back on the wall where it had previously hung. This was the wall where Complainant had recently hung some of his pictures. He reported that instead of removing Complainant's recently hung pictures, he simply placed the clown picture in the available space above Complainant's pictures.

Niebor Decl., Ex. H-13. Plaintiff attaches pictures of the various framed pictures hanging in the Station. *See* Curtis Decl., Ex. D. The pictures show a room full of framed pictures. In one area, above a recessed area, there are three pictures, presumably those hung by Curtis. Above the middle picture is

United States District Court
For the Northern District of California

the framed picture of a clown, with a stylized logo stating "Downtown Clowns." *Id.*

Placed in context, the entire event loses not only its character as racially motivated, but as harassment at all. The evidence decisively shows -- indeed, plaintiff agrees -- that the clown photo was in fact a mascot for the station, that it previously hung where he placed the pictures, that plaintiff himself had taken it down, and that plaintiff found nothing offensive about the picture prior to his removal of it. Another employee simply hung the picture back up, and instead of replacing one of plaintiff's pictures, hung it above them.

Only two other incidents directly implicate race. The first also involves the pictures of African-American firefighters. Plaintiff argues that two days after hanging the pictures, "on February 2, 2009, FF Curtis overheard Caucasian firefighters from A Shift make jokes about the photos." Pl.'s Mot. at 7; *see also* Curtis Decl. ¶ 29. It is unclear from the papers what the jokes were. At deposition, plaintiff was asked about it, but did not recall the jokes. Pl.'s Dep. 274:6-20. The EOPD investigation found the following:

> 1) Capt. James Ready remarked, "The B-shift wants the A-shift shop steward to talk to them." 2) Firefighter Jason Lloyd responded, "Why do they want the A-shift shop steward to talk to them? Don't they have their own shop steward?" 3) Firefighter Roger Prieto said, "Maybe he's in the picture."

Nieboer Decl., Ex. H-12. In the investigation, Lieutenant Lloyd, not Prieto, stated that he made the comment regarding the pictures. *Id.* The Court agrees with plaintiff that, if true, the joke may reference the race of members of B-Shift.

The only other incident directly implicating race led to a complaint filed against plaintiff for leveling allegations of racism. On March 25, 2008, Firefighter Mario Castillo went to the store to purchase groceries for the B-Shift. Upon his return, Curtis alleges that he found raw meat on the counter, and that Castillo "had used B-Shift's money to buy items other than the ones requested by B-Shift, such as children's food, and failed to purchase enough food to feed the shift for the week." Pl.'s Mot. at 3-4. This led to a confrontation between Castillo on the one hand, and Curtis and Firefighter Charles Lightfoot (African-American) on the other. According to plaintiff, "when Mr. Lightfoot expressed his opinion that other firefighters at Station 1 did not like B-Shift because most of them were African-American, Castillo said that Lightfoot 'acted like a thug' and that he 'walked around with a chip

14

United States District Court
For the Northern District of California

on his shoulder.'" *Id.* Castillo also called B-Shift "f—ed up." *Id.* In Castillo's later-filed EOPD complaint due to this incident, Castillo admitted that he stated Lightfoot "walks into a room with a 'skull cap' pulled halfway down his eyes and his chest 'puffed out'." Nieboer Decl., Ex. B-3. Castillo contended that Curtis then responded, "would you be happier if he (Firefighter Lightfoot) painted his face and danced for you?" *Id.* This led Castillo to file a complaint with the EOPD against plaintiff and Lightfoot, alleging racial harassment and hostile work environment. Plaintiff provides no evidence that any deficient grocery purchases constituted harassment or were racially motivated. Castillo's reference to a "skull cap" and that members of the B-Shift were "f—ed up" may have racial connotations. Otherwise, the weight of the evidence shows plaintiff raised the racial implications of the incident.

Plaintiff's other claims are facially race-neutral and many have no known perpetrator. Facially race-neutral events are admissible to support a hostile work environment claim, but the plaintiff must establish that the race-neutral events were in fact motivated, at least in part, by bias. *See Alfano v. Costello*, 294 F.3d 365, 377-78 (2d Cir. 2002) ("In a hostile work environment case, it may well be a proper exercise of the district court's broad discretion to allow the plaintiff to build her case partly by adducing incidents for which the link to any discriminatory motive may, in the first instance, appear tenuous or nonexistent. The plaintiff must, however, establish at trial that incidents apparently sex-neutral were in fact motivated by bias.") While the parties dispute how a dead bird ended up under Curtis' bed, plaintiff provides no evidence that even if it was placed there by another firefighter, it was done so because of his race. Plaintiff also provides no evidence as to who hid his keys, or that it was motivated by race. *See* Pl.'s Dep. 230:7-9. Nor does plaintiff establish that honey found on his dorm room floor was placed there intentionally, that it was "directed" at him or done so based on race.[7]

The Court agrees that tampering with B-Shift's syrup is a very serious charge, but plaintiff presents no evidence that it was directed at him or done because of the racial makeup of B-Shift. Engineer Monte Gardea (Hispanic) admitted that prior to 2007 (and plaintiff's arrival), he poured tap

---

[7]The EOPD found that two A-Shift employees were involved in pranks against each other, including setting "honey traps" involving saran wrap and honey, that led to the throwing of honey at one another. Neiboer Decl., Ex. E, at 3-4. "[Firefighter Prieto] stated that honey was spread in various parts of the upstairs dorm area, including the location where firefighter Curtis sleeps. Firefighter Prieto indicated that he attempted to clean up the honey, but there were probably spots he missed."

United States District Court

For the Northern District of California

water in the maple syrup which exclusively belonged to the B-shift.  According to the EOPD report, Gardea stated that he "put tap water in the syrup as a prank on former Battalian Chief Frediani (Caucasian) because Frediani really liked maple syrup and was possessive with it.  He stated that he 'watered down' the syrup to take away some of the sweetness.'"  Nieboer Decl., Ex. E-4.  Whether or not the Court credits Gardea's explanation, it is plaintiff's burden to raise a triable issue of fact that the harassment was based on race.  Plaintiff's only evidence – that the B-Shift was the only shift with African-American members –  is insufficient to sustain a charge of racial animus, particularly in light of the fact that B-Shift also had white, Asian, and Hispanic personnel.  Hom Decl. ¶¶  19-20.

Taken in a light most favorable to plaintiff, only two incidents raise a disputed fact of racial nexus: Castillo's "skull cap" and "f—ed up" comments, and the A-Shift members' joke regarding the photos of African American firefighters.  Plaintiff fails to provide any evidence the other incidents were done on account of race, or, in the case of the clown picture, even constituted a form of harassment.

### B.    Severe or pervasive harassment

The second step requires that plaintiff show the conduct at issue was sufficiently severe or pervasive to create a hostile work environment.   "In determining what constitutes 'sufficiently pervasive' harassment, the courts have held that acts of harassment cannot be occasional, isolated, sporadic, or trivial; rather the plaintiff must show a concerted pattern of harassment of a repeated, routine or a generalized nature."  *Fisher v. San Pedro Peninsula Hosp.*, 214 Cal. App. 3d 590, 609 (1989).  The Court finds instructive *Vasquez v. County of Los Angeles*, 349 F.3d 634 (9th Cir. 2003).  In *Vazquez,*  the plaintiff complained the defendants made statements that he had a "typical Hispanic macho attitude" and that he should consider transferring to the field because "Hispanics do good in the field." The plaintiff also cited two instances where one defendant yelled at him and two made false complaints about his work.  The court concluded that this conduct, which included two race-related remarks, as well as a few other isolated incidents, was not sufficiently severe or pervasive to be actionable.  *Id.* at 639; *see also Manatt v. Bank of* Am., 339 F.3d 792, 798 (9th Cir. 2003) (claims not sufficiently severe or pervasive where co-workers called plaintiff "China man," pulled their eyelids back to mock those of the Asian race, and otherwise directed racially insensitive behavior at plaintiff); *cf.*

1    *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1114-15 (9th Cir. 2004) (reversing summary judgment

2    and finding issues of fact on hostile work environment claim where plaintiff was frequently subjected

3    to racial insults by supervisors and coworkers, racist graffiti appeared regularly in the bathroom and on

4    equipment, and plaintiff's supervisor subjected him to dangerous work conditions).

5           Unlike in *Vazquez*, plaintiff has presented no evidence of race-related remarks or that defendants

6    engaged in stereotyping. Instead, taking the evidence in a light most favorable to him, plaintiff presents

7    evidence of racially motivated behavior in a joke about the photos of African-American firefighters he

8    placed on the wall and Castillo's comment that B-Shift was "f–ed up." He also presents a handful of

9    facially race-neutral events caused by varied or unknown actors over the course of three years with no

10   evidence of any racial motivations.[8] The Court finds this is insufficient to rise to the level of severe or

11   pervasive. *See Mannatt*, 339 F.3d at 798; *see also Jordan v. Clark*, 847 F. 1368, 1374-75 (9th Cir.

12   1988) (phone calls, off-color jokes, and sexual proposition not sufficiently severe to meet hostile work

13   environment claim). As the Ninth Circuit has stated, Section 1981, like Title VII, is not a "general

14   civility code." *Manatt v. Bank of Am.,* NA, 339 F.3d 792, 798 (9th Cir. 2003) (*citing Faragher v. City

15   of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (discussing Title VII).

16   "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount

17   to discriminatory changes in the 'terms and conditions of employment.'" *Id.*; *see also Lyle v. Warner

18   Bros. Television Productions*, 38 Cal. 4th 264, 279 (2006) (liability may arise when a workplace is

19   "permeated with discriminatory intimidation, ridicule, and insult."). Here, plaintiff's claims that could

20   reasonably be considered harassment do not rise to the level of severity or pervasiveness needed to

21   survive summary judgment.

22          Plaintiff has therefore failed to meet his burden of showing a triable issue of fact regarding a

23   hostile work environment. Accordingly, defendants' motion for summary judgment on the hostile work

24   _____

25          [8]In plaintiff's reply, plaintiff argues that the written reprimand and one-shift suspension can also
be considered harassment. Pl.'s Reply at 5-6. Plaintiff recognizes that, generally, personnel
26   management actions such as official disciplinary actions do not rise to the level of harassment, *see Reno
v. Baird*, 18 Cal. 4th, 640, 646 (1998), but argues that when the conduct is outside the scope of
27   necessary job performance, it can be actionable, *citing Janken v. GM Hughes Elecs.*, 46 Cal. App. 4th
55, 63 (1996). Because the Court finds below that defendants had a legitimate, non-retaliatory reason
for the actions, the Court does not consider the disciplinary actions to constitute harassment. Even if
28   they were, *arguendo*, the Court finds this still does not rise to the level of severe or pervasive.

environment claim is GRANTED.

### 3.    Retaliation

To establish a prima facie case of retaliation under FEHA, a plaintiff must prove that (1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action. *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1042 (2005). Once an employee establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action. *Id.* If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation "drops out of the picture," and the burden shifts back to the employee to prove intentional retaliation. *Id.*

Defendants do not dispute that plaintiff engaged in protected activity. He filed two complaints with the EOPD -- one on June 17, 2008 and another on February 17, 2009. *See* SAC ¶ 14; Neiboer Decl., Exs. E, H-1. The complaints constitute protected activity.

Defendants do dispute that plaintiff suffered any adverse employment actions because he filed the complaints. *See* Def.'s MSJ at 23. An initial question exists as to what activities constitute adverse employment actions. The parties agree that the October 22, 2009 written reprimand and Curtis' one-shift suspension qualify as adverse employment actions. Plaintiff also seeks to include as adverse employment actions the dead bird he found under his bed, the honey found in his room, the fact that members from A- and C-Shift "started to shun FF Curtis and refused to trade shifts or perform the basic information exchange," the clown picture placed above the pictures, the fact that his keys were hidden from him, as well as "false reports" filed against him by defendant Torres and Torres' "refus[al] to permit FF Curtis to participate in training sessions." Pl.'s Opp. at 23. Defendants argue that these do not constitute adverse employment actions.

The California Supreme Court, in *Yanowitz*, analyzed what types of treatment should properly be considered discriminatory under FEHA and Title VII. The court stated:

> As [the Supreme Court] recognized in *Harris [v. Forklift*, 510 U.S. 17 (1997)], the determination of what type of adverse treatment properly should be considered discrimination in the terms, conditions, or privileges of employment is not, by its nature, susceptible to a mathematically precise test, and the significance of particular types of adverse actions must be evaluated by taking

into account the legitimate interests of both the employer and the employee. Minor or relatively trivial adverse actions or conduct by employers or fellow employees that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment and are not actionable, but adverse treatment that is reasonably likely to impair a reasonable employee's job performance or prospects for advancement or promotion falls within the reach of the antidiscrimination provisions of sections 12940(a) and 12940(h).

*Yanowitz*, 36 Cal. 4th 1028, 1054-55 (2005). The Ninth Circuit, in *Kortan v. California Youth Authority*, 217 F.3d 1104, 1112 (9th Cir. 2000), found that a supervisor's laughing at and stating that plaintiff "got him on sexual harassment charges," ridiculing her to other employees, hostile stares, calling her "Madea," and falsely accusing her of not submitting a work order to have her desk repaired, among other allegations, did not constitute adverse employment actions. *See also Nunez v. City of Los Angeles*, 147 F.3d 867, 875 (9th Cir. 1998) (badmouthing an employee outside of the job reference context does not constitute adverse employment actions); *Manatt v. Bank of America NA*, 339 F. 3d 792, 803 (9th Cir. 2003) ("Mere ostracism in the workplace is not grounds for a retaliation claim.")

In light of this Court's analysis that some of plaintiff's claims did not constitute harassment at all, *supra*, the Court also finds that the non-disciplinary actions he lists do not constitute adverse employment actions, with one exception. Viewed in a light most favorable to plaintiff, the bulk of the incidents are "relatively trivial adverse actions or conduct by employers or fellow employees that, from an objective perspective, are reasonably likely to do no more than anger or upset" the plaintiff. *Yanowitz*, 36 Cal. 4th at 1055. They do not rise to level of actions reasonably likely to impair a reasonable employee's job performance or prospects for advancement. *See id.* This includes plaintiff's March and April 2009 allegations against Battalion Chief Ray, wherein she requested a report from plaintiff regarding a claim made by another firefighter (Elliot), and asked him to come to a number of meetings. Nowhere does plaintiff state how these actions were adverse or rise above the level of "relatively trivial."

The one exception is plaintiff's claim that when Torres was leading a training session with the fire truck ladder on December 6, 2009, he refused to allow plaintiff to participate in the training. Curtis Decl. ¶ 58. Under the *Yanowitz* factors, a failure to train can be construed as an adverse employment action.

United States District Court
For the Northern District of California

The question before the Court, then, is whether the ladder incident, the October 22, 2009 written reprimand and the subsequent one day suspension -- the adverse employment actions -- were in response to Curtis' filing of complaints. Plaintiff's sole argument that a causal link exists between the protected activity and the adverse action is that "the retaliation began almost immediately after the filing of the initial complaint on June 17, 2008, and continued until FF Curtis left Station 1. He was the intended target and victim of numerous acts which when seen as a whole, consist in an [sic] adverse employment action." Pl.'s Opp. at 23-24.

However, the Court has already rejected plaintiff's contention that those "numerous acts" constitute adverse employment action. Plaintiff's reliance on temporal proximity therefore fails. According to the Supreme Court, "the cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001); *citing O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (Cal. App. 2001) (3-month period insufficient). Here, plaintiff filed the EOPD complaints in July 2008 and February 2009; the disciplinary actions and ladder incident did not occur until October 2009, December 2009, and January 2010, respectively. As in *Clark County*, this minimum 7-month period shows "no causality at all." *Id.*

Moreover, defendants have established a legitimate, non-retaliatory reason for the actions. The written reprimand letter sets forth the following claims:

> On September 1, 2009, you [plaintiff] displayed unprofessional behavior by speaking in a hostile and intimidating tone towards Firefighter/Paramedic Frank Mui.
>
> On February 27, 2009, you were insubordinate by neglecting to complete a 538-8 as directed. When confronted, you displayed unprofessional and aggressive behavior towards both Lieutenant Simmons and Captain Torres.
>
> On February 3, 2009, you did not attend a joint A and B-Shift meeting coordinated by Chief Simon that you were directed to attend. On the same date, you did not attend an all-hands shift meeting called by Battalion Chief Ray. Both of these actions are acts of insubordination. You then proceeded to display unprofessional behavior by acting unprofessionally and aggressively towards both Lieutenant Simmons and Captain Torres.

Hom Decl., Ex E.

United States District Court

For the Northern District of California

After defendants have shown a legitimate, non-retaliatory reason, plaintiff then must show that the stated reasons are not the true reasons, but instead are a pretext for discrimination. *Reeves v. Sanderson Plumbing Products Inc.,* 530 U.S. 133, 143 (2000). Evidence of pretext must be both specific and substantial. *Bergene v. Salt River Agric. Improvement & Power Dist*, 272 F.3d 1136, 1142 (9th Cir. 2001). Plaintiff states that the reprimand letter was based on allegations contradicted by Lt. Simmons in his October 29, 2009 letter. In that letter, Simmons writes that "several portions of the document are skewed with information that is not factual - in no verbal or written statements did I indicate that FFPM ["Firefighter/Paramedic"] Curtis was hostile/aggressive toward me on the dates in question; secondly, the conversation between FFPM Curtis and FFPM Mui on September 1st was 'vocal' at times by both parties; however, FFPM Curtis did not act in an intimidating manner toward FFPM Mui." Curtis Decl., Ex. 11.

In defendants' attached declaration, Simmons clarifies that "in the letter that I wrote, I explained that I had not previously indicated that plaintiff had been aggressive or intimidating toward me. However, on the occasions that were witnessed by others, I do not know what their impression may have been. In the letter that I wrote I also indicated that the September 1, 2009 conversation between plaintiff and FFPM Mui was vocal by both parties. Although I did not believe Plaintiff acted in an intimidating manner toward FFPM Mui, I do not know how Mui felt during the vocal confrontation with plaintiff." Simmons Decl., ¶ 18.

The Court finds that even if plaintiff established a prima facie case, he has failed to meet his burden of providing specific and substantial evidence of pretext. The effect of Simmons' October 29, 2009 letter is diluted by his later attached declaration. Moreover, neither provides substantial and specific evidence that the reprimand was actually pretext to retaliate against the EOPD complaint filed 7 months earlier. The reprimand was based not only on the September 1, 2009 incident, but on three other incidents, including the argument between plaintiff and his superior, Captain Torres, on February 3, 2009. Even taking plaintiff's characterization of the February 3, 2009 incident as true, it would show only that Torres was the one acting out of turn during the argument; it would not prove by specific and substantial evidence that the reprimand was due to filing the EOPD complaint. In other words, even assuming *arguendo* that plaintiff was wrongfully reprimanded, he fails to establish that it was due to the

protected activity.

As defendants have shown legitimate, nondiscriminatory reasons for its actions, and plaintiff have failed to rebut them by proving pretext, the Court finds that the written reprimand did not constitute unlawful retaliation.

Regarding the ladder incident, it is undisputed that the ladder training occurred following an alarm call, in which plaintiff recalls that he may have raised the aerial ladder. Curtis Dep., 343:3-354:24. Plaintiff testified that he heard that another firefighter, Bruce Fontelera, told Captain Torres that plaintiff had done a good job raising the aerial ladder during the call. *Id.* Torres understood that plaintiff had done well with the task and therefore recommended that a different, more junior firefighter, Wale Forrester (also African-American) be given an opportunity to raise the ladder as well. Torres Decl. ¶ 27. Further, even if Torres had not allowed plaintiff to raise the ladder out of some sort of animus, plaintiff does not establish that it was done in response to a complaint filed 8 months earlier.

Finally, plaintiff's contentions with respect to the one-day suspension mirror those regarding the reprimand. The January 8, 2010 letter from the OFD Administrative Offices advises plaintiff that the suspension was based on the following:

> On Wednesday, September 16, 2009, during the roll call, when Lieutenant Simmons discussed the documentation of narcotics at change of shift, you inappropriately interjected negative comments. When Captain Torres asked you to discuss the issues you brought up later, you responded to Captain Torres: "you don't have the ability to understand, or to handle this." When Capt. Torres requested that the discussion needs to discontinue [sic], you refused to do so.
> . . .
>
> Furthermore, you were given the written reprimand for insubordination and unprofessional behavior on October 22, 2009.
> . . .
>
> The Department relied upon the following documents in making this recommendation and copies are attached:
> 1. City of Oakland Civil Service Rule 10
> 2. Administrative Instruction #523 - Disciplinary Policy and Procedures
> 3. Oakland Fire Department Rules and Regulations, Section 20.4 - Insubordination
> 4. Oakland Fire Department Rules and Regulations, Section 12.7 - Execution of lawful order of an officer
> 5. Performance Appraisal FY 2009-10
> 6. Memo from Battalion Chief Jennifer Ray dated on September 17, 2009 titled Recommendation for Discipline for Ron Curtis

7. Form 538-8 from Captain Joseph Torres to Battalion Chief Jennifer Ray dated on September 16, 2009 titled PM Ron Curits' [sic] Disruptive Behavior and Act of Insubordination

8. Memo from Battalion Chief Jennifer Ray to Firefighter/Paramedic Ronald Curtis dated on October 22, 2009 titled Written Reprimand - Insubordination/Unprofessional Behavior

Hom Decl., Ex. G.

Plaintiff argues that OFD's explanation was pretextual because Ray relied solely on a report of Torres, instead of obtaining reports "from any neutral witnesses to the incidents. Had defendant Ray obtained reports from all witnesses, both the written reprimand and the one-shift suspension would not have been granted." Pl.'s Opp. at 25. Such an allegation does not rise to the level of "specific and substantial" evidence needed to show pretext. *See Salt River Agric. Improvement & Power*, 272 F.3d at 1142. Moreover, even if true, it does not show a causal nexus between the suspension and plaintiff's protected activity. Accordingly, defendants' motion for summary judgment on the issue of retaliation is GRANTED.

**4.      Failure to prevent**

Under California Government Code Section 12940 (k), "it is an unlawful employment practice . . . [f]or an employer . . . to fail to take all reasonable steps necessary to prevent discrimination and harassment form occurring." A plaintiff making a claim under this section must first prove that he was the victim of actionable discrimination. *See Truillo v. North County Transit Dist.*, 63 Cal. App. 4th 280, 289 (1998). Because the Court has found the absence of discrimination or retaliation, this claim necessarily fails. Accordingly, defendants' motion for summary judgment on this claim is GRANTED.

**CONCLUSION**

Defendants' motion for summary judgment is GRANTED. Plaintiff's motion for summary judgment is DENIED.

**IT IS SO ORDERED.**

Dated: March 13, 2012

_____
SUSAN ILLSTON
United States District Judge