UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALD EL-MALIK CURTIS,<br><br>   Plaintiff,<br><br>   v.<br><br>CITY OF OAKLAND, et al.,<br><br>   Defendants. | Case No. 10-cv-00358-SI<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR NEW TRIAL**<br><br>Re: Dkt. No. 313 |

Presently before the Court is plaintiff's motion for a new trial. Dkt. No. 313. This matter is scheduled to be heard on March 25, 2016. Pursuant to Civil Local Rule 7-1(b), the Court finds this matter appropriate for resolution without oral argument and VACATES the hearing. For the reasons set forth below, the Court DENIES plaintiff's motion in its entirety.

**BACKGROUND**

Plaintiff Ronald Curtis is African-American, and a firefighter paramedic in the Oakland Fire Department ("OFD"). Dkt. No. 116. Plaintiff, who has been employed with the OFD since 2004, alleged that after he transferred to Station 1 of the OFD in 2007 and was placed on the "B Shift," he was subjected to a hostile work environment based on his race, and he experienced retaliation because he reported the racial discrimination. *Id.*; Second Amended Complaint ("SAC") ¶¶ 11-14, 37-39, Dkt. No. 27.

**I. Procedural History Prior to Trial**

This Court originally granted defendants' motion for summary judgment, dismissing the action prior to trial. Dkt. No. 139. In that order, the Court concluded that plaintiff had no

evidence to support his allegations of racially harassing conduct. The Court found that the complained-of acts were either not racially motivated or had no known perpetrator, or both. *See id.*, at 11-16.[1] Additionally, the Court found that plaintiff presented no evidence that the conduct he alleged was severe or pervasive. *Id.* at 16-18. The Court also dismissed plaintiff's retaliation allegation, finding that plaintiff had not demonstrated any adverse employment actions, that defendants had legitimate, non-retaliatory reasons for their conduct, and that plaintiff failed to demonstrate that the reasons offered by defendants were pretexual. *Id.* at 18-23.

This Court's summary judgment order was reversed on appeal. *See* Dkt. No. 150. In its decision on the harassment claim the appellate court determined that there was evidence in the record from which a reasonable jury could infer that the individuals engaging in the allegedly harassing conduct "were firefighters of other races and that they were targeting Curtis's shift because it was predominantly African-American." *Id.* at 2. The court further reasoned that the facts plaintiff proffered in support of his harassment claim "established the existence of a genuine dispute of fact as to whether a reasonable African-American man would find the workplace so objectively and subjectively racially hostile as to create an abusive working environment." *Id.* at 4. The court listed the following facts that plaintiff advanced in support of his harassment claim, concluding that these acts "*may* constitute threatening and humiliating actions that could unreasonably interfere with an employee's work performance":

> tampering with an employee's food, stealing personal items, leaving dead animals in an employee's workspace, placing a clown picture over a picture of a prominent African-American, demeaning an employee's work unit, and repeatedly shunning a group of employees[.]

*Id.* (emphasis added).

On the retaliation claim the appellate court concluded that plaintiff had suffered adverse employment actions, and that some of his protected activities were close enough in time to the adverse employment actions to establish a prima facie causal link. *Id.* at 4-5. The court further concluded that while defendants offered legitimate reasons for the actions, plaintiff offered competing evidence suggesting that he was improperly disciplined and that defendants failed to

---

[1] The page numbers indicated correspond to the page numbers generated by ECF.

1  follow some of their own procedures. *Id.* at 5. The court determined that the suit should proceed
2  as to the individual defendants, because, according to the court, plaintiff provided evidence of
3  their personal participation in the alleged rights deprivations. *Id.* The appellate judgment was
4  entered in April 2014. Dkt. No. 151.

5        The parties accordingly prepared this case for trial. A preliminary pretrial conference was
6  conducted in July 2014. Trial was set for March 2015 and the time estimated for trial was
7  between 10-15 court days. *See* Dkt. No. 158. The final pretrial scheduling conference was
8  conducted on March 17, 2015, based on the parties' pretrial submissions (Joint Pretrial Conference
9  Statement, motions in limine, etc.). Dkt. No. 202. In the Joint Pretrial Conference Statement
10 (Dkt. No. 170, filed March 3, 2015), plaintiff estimated that the trial would take 10 court days;
11 defendants estimated that it would take 15 days. *See* Dkt. 170 at 29. However, plaintiff initially
12 listed 49 witnesses and defendants listed 22, although some of defendants' witnesses were
13 duplicative of plaintiff's. Dkt No. 170-1. Gerald Simon, a defendant in the case, was identified as
14 a witness on plaintiff's proposed list. *Id.* At the conference, the Court noted that, due to the
15 number of trial witnesses identified by the parties, the Court was concerned that the trial would not
16 be completed in the time allotted. The Court cautioned the parties to streamline and otherwise
17 reduce the number of witnesses. *See* Dkt. No. 202.

18       The final pre-trial scheduling order reflected what was discussed in the conference. The
19 Court provided the parties substantially more time than had been requested, with each side allotted
20 "25 hours total for presentation of evidence, which includes direct and cross-examination and
21 presentation of all exhibits." Dkt. No. 204. The Court noted that "this extended schedule . . .
22 ha[s] been developed based on the parties' extensive witness lists." The court stressed that the
23 parties should "reexamine their trial plan (56 witnesses are currently listed) in an effort to
24 streamline the trial." *Id.*

25       The trial date was thereafter continued into November 2015. The Court issued an order on
26 October 21, 2015 that included an anticipated trial schedule for the parties. Dkt. No. 227. The
27 Court's calendar, the needs of the jury commissioner's office in light of other trials beginning the
28 week of November 2, 2015, the hours allotted to the parties in the pretrial order, and the

1    availability of jurors during Thanksgiving week required the Court to begin jury selection on
2    November 4, 2015.  *See id.*

3           Plaintiff subsequently filed a second amended witness list that reduced the number of
4    witnesses from 38 to 34.  Dkt. No. 233.  On November 6, 2015, plaintiff's counsel emailed
5    defense counsel indicating her intent to call Gerald Simon as a witness the following week.  Dkt.
6    No. 315 at Exh. A.

7           Trial began on November 9, 2015, and the jury was instructed on December 7, 2015.  The
8    jury reached its verdict on December 8, 2015.  Dkt. Nos. 240, 275, 276.

10   **II.   Trial**

11          Plaintiff called seventeen witnesses at trial.  Dkt. Nos. 240, 241, 245, 247, 248, 249, 250,
12   253, 254.  Plaintiff's witnesses recounted the allegations contained in his complaint:  (1) that
13   plaintiff and his co-workers on the B Shift heard that a firefighter had allegedly tampered with the
14   syrup that was reserved for the B Shift; (2) that plaintiff and members of the B Shift filed a formal
15   charge of discrimination with the Equal Opportunity Programs Division of the City of Oakland
16   ("EOPD"); (3) that a dead bird was found in plaintiff's room underneath his bed and honey was
17   found on the floor of his dorm area; (4) that plaintiff's keys went missing during a shift change,
18   then were found later in an unfamiliar location in the station house; and (5) that a photo of a
19   clown, the station mascot, was placed over the pictures of the African-American firefighters that
20   plaintiff had mounted on a wall.  *See, e.g.*, Dkt. No. 27 at 3-6; Dkt. No. 307 at 37, 143, 151, 157,
21   111-114, 143, 167-168; Dkt. No. 315-2; Dkt. No. 315-3; Dkt. No. 315-4; Dkt. No. 315-5; 315-6.
22   Plaintiff and plaintiff's witnesses were also permitted to explain the history of Station 1, the
23   context of the events, as well as their personal perceptions and experiences during the relevant
24   time period, among other matters.  *See, e.g.*, Dkt. No. 297 at 136, 184-196 (expert testimony); Dkt.
25   No. 295 at 19-34 (Lightfoot), 109-145 (Holmes), 196-215 (Forrester).

26          Jennifer Ray, one of the defendants in this case, was called by plaintiff as a witness.  Dkt.
27   No. 312 at 47.  She was asked to explain a series of documents, such as a performance evaluation
28   of plaintiff that she reviewed, *id.* at 56-57, a letter of reprimand that she sent to plaintiff, *id.* at 58,

4

reports from other firefighter directed to her, *id.* at 152-153, 156, 179-184, as well as notes taken by another firefighter that were given to her, *id.* at 193, among other matters.

At one point in the case, Captain James Ready was called by the defense and asked to explain a series of photographs taken of the station house. *See* Dkt. No. 306 at 96-104.

Toward the end of plaintiff's presentation of evidence, his counsel petitioned the Court for more time. After taking the matter under submission, the Court provided each side with 4.5 additional hours, extending the total number of hours designed for each side to 29.5 hours. Dkt. No. 307 at 5, 189; Dkt. No. 279 at 16.

As plaintiff ran out of time, the Court stated: "So you're out of time . . . is the problem. And we are supposed to finish [in two days], so it's not a mere [ill]usory time limit. It's a real time limit and you're out of it. So what should we do about this?" Dkt. No. 305 at 176-177. Plaintiff's counsel responded: "I would propose that plaintiff . . . rest at this time, and I would ask to be given an allotment of, perhaps, 10 minutes per witness [for cross examination], maybe 15 . . . for Defendant [Gerald] Simon." *Id.* at 177. The Court inquired of defendants how many witnesses defendants intended to call. Defendants answered that they had "several, quite a few that have been waiting today"; when pressed by the Court, defendants answered that they had "between 15 and 20" witnesses they intended to call. *Id.* The Court then informed plaintiff's counsel: "I'll give you 10 minutes for Chief Simon, and I'll give you five minutes for anybody else you need to cross. But no more than that because we do need to finish by Thursday." *Id.* at 177-178. The Court did not restrict who could be called as witnesses, in what order witnesses were to be called, or how long witnesses were to be examined.[2] Further, on the last day of testimony, defendants petitioned the court for additional time to present key witnesses. This request was also granted. Dkt. No. 308 at 192-195.

The parties actively participated with the Court in fashioning jury instructions, both prior to trial and during the proceedings. Dkt. Nos. 198, 251, 256, 260, 261, 263, 264, 267, 274.

The jury reached a defense verdict on its second day of deliberations. Dkt. Nos. 275, 276.

---

[2] Notably, by the Court's calculation, plaintiff was provided 31 hours, 41 minutes of time and defendants were provided 31 hours, 19 minutes of time, overall.

Plaintiff now moves for a new trial, alleging that: (1) key jury instructions did not follow the law of the case; (2) the time limits imposed by the Court unfairly prejudiced plaintiff; (3) erroneous evidentiary rulings prejudiced plaintiff; and (4) the verdict in favor of the City was against the clear weight of the evidence. Dkt. Nos. 313, 317. Plaintiff's arguments are addressed in this order.

## LEGAL STANDARD

Federal Rule of Civil Procedure 59(a) provides that, "The court may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" A new trial may be ordered to correct manifest errors of law or fact, but "[t]he burden of showing harmful error rests on the party seeking the new trial." *Boston Sci. Corp. v. Johnson & Johnson*, 550 F. Supp. 2d 1102, 1110 (N.D. Cal. 2008) (citation omitted). The trial court may grant a new trial, even though the verdict is supported by substantial evidence, if "the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial judge, a miscarriage of justice." *Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1359 (9th Cir. 1976). "The authority to grant a new trial . . . is confided almost entirely to the exercise of discretion on the part of the trial court." *Allied Chem. Corp. v. Daiflon*, 449 U.S. 33, 36 (1980).

## DISCUSSION

### I. The Jury Instructions

Plaintiff contends that two issues in this case were "considered and determined" by the Ninth Circuit, and this Court "prejudicially restrict[ed]" the jury instructions in this case. Dkt. No. 313 at 10. First, plaintiff asserts that the appellate court "specifically held" that harassing conduct in this case could include:

> tampering with an employee's food, stealing personal items, leaving dead animals in an employee's workspace, placing a clown picture over a picture of a prominent African-American, demeaning an employee's work unit, and repeatedly shunning a group of employees[.]

*Id.*

Plaintiff mischaracterizes the Ninth Circuit decision. On appeal, the court determined that plaintiff had presented sufficient facts, such as those recounted above, for a reasonable jury to infer that he was subject to harassment. *See* Dkt. No. 150 at 2 (remand order). In other words, the appellate court's recitation of plaintiff's facts was not a legal holding; it was a determination by that court that this Court erred in the first instance in not permitting plaintiff's case to proceed to trial.

It is well established that instructions should not be argumentative or slanted in one party's favor. *See United States v. Maxwell*, 579 F.3d 1282, 1304-05 (9th Cir. 2009) (reasoning that a trial court does not have to give instructions which contain partisan and argumentative statements of law and fact). Jury instructions should provide the relevant rules of law generally and avoid singling out or stressing particular evidentiary items or legal theories; otherwise, the court's emphasis of certain facts or issues may cause a juror to attach undue importance or credibility to the selected matters. *Chuman v. Wright*, 76 F.3d 292, 294 (9th Cir. 1996) ("Jury instructions must be formulated so that they fairly and adequately cover the issues presented, correctly state the law, and are not misleading."). Additionally, the district court has substantial latitude in tailoring jury instructions. *Browning v. United States*, 567 F.3d 1038, 1041 (9th Cir. 2009).

Here, the Court directed the parties to prepare jury instructions that were "brief, clear, written in plain English and free of argument." Dkt. No. 158-1 at 3. Plaintiff's proposed instructions were statements of his allegations in this case. Dkt. No. 198 at 46; Dkt. No. 263. Plaintiff was provided ample opportunity to argue those facts to the jury. In fashioning final jury instructions, the Court drew from the Ninth Circuit Model Instructions that accurately reflected what the jury should consider in determining racially harassing conduct. Dkt. No. 274.

Plaintiff additionally asserts that this Court's instruction did not adequately define the protected activity. Dkt. No. 313 at 11-12. The Court rejects plaintiff's argument for the same reason. *See* Dkt. 274 at 43-44. Plaintiff was not entitled to an instruction that reiterated all the arguments he made at trial in an effort to establish this element. The basis for the Ninth Circuit's decision reversing this Court's initial summary judgment order was that plaintiff established the

7

1  existence of a genuine issue of material fact on his racial harassment and retaliation claims. The
2  mandate was to let a jury decide these claims. *See* Dkt. No. 150 at 4, 6. That mandate was fully
3  carried out.

## II. The Court's Imposition of Time Limits

Plaintiff alleges that the limitations that the Court placed on plaintiff's counsel "unfairly impeded her ability to effectively cross-examine the witnesses." Dkt. No. 313 at 12-13.

As recounted above, both parties were on notice as far back as March 2015 that the Court would provide each side "25 hours total for presentation of evidence, *which includes direct and cross-examination* and presentation of all exhibits." Dkt. No. 204 (emphasis added). At that time, the Court stressed that the parties should "reexamine their trial plan (56 witnesses are currently listed) in an effort to streamline the trial." *Id.* When plaintiff petitioned the Court for additional time toward the close of plaintiff's case, the Court provided each side with 4.5 hours, extending the total number of hours designed for each side to 29.5 hours. Dkt. No. 307 at 5, 189; Dkt. No. 279 at 16. Plaintiff ran out of time, even with this additional time provided by the Court. Plaintiff's counsel's proposed solution was to be "given an allotment of, perhaps, 10 minutes per witness [for cross examination], maybe 15 . . . for Defendant [Gerald] Simon." Dkt. No. 305 at 177. In order to fairly provide the defense with time, the Court initially provided counsel with 10 minutes of time to cross-examine Chief Simon, and approximately five minutes of time for other witnesses. *Id.* at 177-178. Plaintiff cannot in good faith argue that "[t]he imbalance of between a 10-15 minute cross-examination and an hour of direct testimony . . . was simply too great to overcome" if counsel suggested such a compromise. Dkt. No. 313 at 12. Additionally, Chief Simon was originally on plaintiff's witness list, plaintiff's counsel informed defense counsel that plaintiff intended to call Chief Simon, and Chief Simon was present in court virtually every day of trial. Dkt. No. 170-1; Dkt. No. 315 at Exh. A.

The use of time limits in this action does not require a new trial.

### III. The Evidentiary Rulings

Plaintiff argues that certain documents, specifically Exhibit Nos. 334, 345, 372, 398, 462 and 463, were admitted during defendant Jennifer Ray's testimony to explain what was reported to her. According to plaintiff, after the documents were admitted, Ray did not testify in the defense case or provide any information regarding how or if she used the documents previously admitted. Plaintiff contends that the reports included hearsay statements and that the jury was "polluted" by these statements. In support of this assertion, plaintiff points to a question posed by the jury during deliberations, asking the court to clarify what evidence was admitted with a limiting instruction. Dkt. 313 at 13.

A review of the record reveals that Jennifer Ray was questioned about Exhibit Nos. 334, 345, 462, and 463. During Ray's testimony she laid the foundation for each document that was then admitted into evidence. Dkt. No. 312 at 152-154, 179-180, 184-186, 193-200. Plaintiff was provided an opportunity to voir dire Ray about Exhibit 462 while Ray was on the stand. *Id.* at 181-182. Exhibit 372 was introduced by defendant Joseph Torres to demonstrate that he provided a written report to Ray in response to one of plaintiff's allegations. Dkt. 308 at 234-235. Finally, Exhibit 398 was a document that plaintiff's witness, Demond Simmons, sent to Chief Simon and was discussed during Mr. Simmons and Chief Simon's testimony, respectively. Dkt. No. 297 at 92-95; Dkt. No. 308 at 208-09.

The Court observes that this case was in part based on reports written by plaintiff and others recounting their impressions during plaintiff's time at Station 1. Plaintiff's own exhibits, specifically, Exhibit Nos. 4, 5 and 6, consisted of many pages of hearsay statements which included allegations of improper conduct by defendants. *See* Dkt. No. 282. The Court provided limiting instructions and clarifying statements on these documents, and others, both during the course of trial and when the jury posed a question during deliberations. *See, e.g.*, Dkt. Nos. 281; 282; 312 at 149, 151, 156, 171, 177, 182, 185-186, 191, 200.

Additionally, plaintiff contends that pictures of the station house used during the testimony of Captain James Ready were prejudicial, because Ready could not authenticate the photographs, and testified that the details contained in the photographs were different from how the Station

1 appeared when plaintiff worked there. Dkt. No. 313 at 14. The photographs were introduced to
2 provide a visual depiction of the various rooms and areas at Station One based on the testimony
3 that was presented. And Captain Ready specifically laid the foundation for each picture that was
4 moved into evidence. Dkt. No. 306 at 97-104, 111-113. The Court finds that plaintiff was not
5 prejudiced by the admission of the photographs.

### IV.    Whether the Verdict is Consistent with the Weight of the Evidence

Finally, plaintiff argues that the jury's verdict in this case was against the clear weight of the evidence. Dkt. 313 at 14-24. The Court concludes that plaintiff's counsel — an experienced and well-respected trial lawyer — put forth a comprehensive and detailed account of plaintiff's version of the facts of this case. The evidence presented was subject to more than one reasonable interpretation, and the jury, tasked with weighing the credibility of the witnesses and affording appropriate credence to the evidence proffered, reached a sound conclusion.

In determining the clear weight of the evidence, a district court has "the duty [ ] to weigh the evidence as [the court] saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in [the court's] conscientious opinion, the verdict is contrary to the clear weight of the evidence[.]" *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990) (quoting *Moist Cold Refrigerator Co. v. Lou Johnson Co.*, 249 F.2d 246, 256 (9th Cir. 1957)). "The law grants trial courts judicial discretion in making this decision for two reasons: (1) the trial judge is the only objective person (with legal training), who was at the trial and able to see, hear, and evaluate the situation using firsthand knowledge; and (2) it would be impossible to construct any strict rule, which would be applicable to every conceivable motion for a new trial." *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1088 (9th Cir. 2009).

Here, contrary to plaintiff's argument to this Court, it was not at all clear that this case "ar[ose] from a cauldron of racial harassment brewing in the heart of downtown Oakland." Dkt. No. 313 at 7. It was clear to the Court, at least, that the evidence established a series of puerile pranks, angry and non-constructive comments, and generally dysfunctional organizational behavior among plaintiff, his co-workers and the supervisors. The situation caused plaintiff, and

various of his co-workers, considerable discomfort and unhappiness. Plaintiff's evidence did not, however, establish that the regrettable behavior and poor communication constituted racial harassment or retaliation. The Court will not overturn the jury's verdict in this case.

## CONCLUSION

Plaintiff's motion for a new trial is hereby DENIED.

**IT IS SO ORDERED**.

Dated: March 23, 2016

SUSAN ILLSTON
United States District Judge

11